Peggy J. CONNOR et al., Plaintiffs,

v.

Wiilliam L. WALLER et al., Defendants.

Civ. A. No. 3830(A).

United States District Court, S. D. Mississippi, Jackson Division.

May 19, 1975.

Frank R. Parker, Jackson, Miss., for plaintiffs.

A. F. Summers, Atty. Gen., Jackson, Miss., for defendants.

Before COLEMAN, Circuit Judge, RUSSELL, Chief District Judge, and COX, District Judge.

COLEMAN, Circuit Judge.

The sole issue in this case is whether House Bill 1290 and Senate Bill 2976[1] of the Acts of the Mississippi Legislature, Regular Session of 1975, approved by the Governor on April 7 and April 8, have reapportioned the State Legislature in conformity with the Constitution of the United States.

The attack on the validity of these Acts is divided into two parts:

(1) The apportionment does not comply with the one person-one vote rule;

(2) The apportionment resulted in an unconstitutional dilution of the black vote for selection of the Legislature.

Since the qualifying deadline for candidates for the Legislature is June 5, 1975, the Court has proceeded to hear and determine the matter as expeditiously as possible, considering the intervention of the Judicial Conference of the Fifth Circuit, April 28–May 1, 1975, which the members of this Court were required by law to attend.

A hearing was held in Jackson on May 7. Briefs have been received and considered. We now decide the case.

Except for the election of Representatives from Harrison County, to be hereinafter discussed, we find no constitutional infirmity. Other than as to Harrison County, the complaint will be dismissed.

*The History of this Litigation*

This three-judge District Court, composed of the same Judges, has been occupied with the reapportionment of the Mississippi Legislature since October 19, 1965, *Connor v. Johnson,* 256 F.Supp. 962 (S.D.Miss., 1966). On July 22, 1966, we invalidated the apportionment of the Mississippi Legislature as it then existed, *Connor v. Johnson, supra.*

The regular quadrennial primary elections were scheduled for August, 1967. We delayed court ordered redistricting so as to give the Mississippi Legislature until December 1, 1966 in which to enact a reapportionment plan of its own. The Legislature was unable to agree on reapportionment in any form.

On March 3, 1967, we found it necessary to enter a decree reapportioning the Senate and the House of Representatives of the State of Mississippi in accordance with the one person-one vote rule, 265 F.Supp. 492 (S.D.Miss., 1967). There was no appeal. These proceedings were grounded on the United States Census of 1960.

There was no further action until the 1971 Legislature (elected in 1967) set about the enactment of a reapportionment based on the 1970 Census. On May 18, 1971, we held that the 1971 legislative reapportionment did not comply with the one person-one vote rule. The 1971 quadrennial elections being imminent, we formulated a court ordered plan of reapportionment, *Connor v. Johnson,* 330 F.Supp. 506. The population figures,

---

1. Copies of the Acts are appended to this opinion.

norms and variances, are there set forth in detail.

On June 3, 1971 (Mr. Chief Justice Burger, Mr. Justice Black, and Mr. Justice Harlan dissenting), the Supreme Court stayed our decree until June 14. We were instructed, absent insurmountable difficulties, to devise and put into effect a single-member district plan for Hinds County and to extend the filing date for legislative candidates from that county to an appropriate date. In addition to the stay, the Supreme Court held that a decree of the United States District Court is not within reach of Section 5 of the Voting Rights Act. The decision on this point was unanimous, *Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268.

On June 16, D.C.Miss., 330 F.Supp. 521, we found that there were insurmountable difficulties to the division of Hinds County into single-member districts. The Supreme Court declined to interfere with this finding.

The 1971 legislative elections were held on schedule in accordance with the decree of May 14, 1971. On January 24, 1972, the Supreme Court declined to invalidate that election, *Connor v. Williams*, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704. However, the Court vacated our prior decree in order that a special master could be appointed to devise single-member districts for Hinds, Harrison, and Jackson Counties, saying "If we are to consider the applicability of *Preisler* and *Wells* to state legislative districts, it would be preferable to have before us a final judgment with respect to the entire State. To accomplish this result and to preserve the right to appeal from such a judgment, the judgment of the District Court is vacated . . . and the case is remanded to the District Court for further proceedings consistent with this opinion".

Significantly, however, the Supreme Court noted, 92 S.Ct. 658, fn. 4, the possibility "That the state legislature will adopt a plan of its own". It further said, "This Court has frequently emphasized that 'legislative reapportionment is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when the Legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so' ".

The outcome of all this was that the 1973 session of the Legislature enacted Chapters 456 and 457 of the Laws of 1973, approved April 6, 1973 [House Bill 1389; Senate Bill 2452], reapportioning the Legislature in anticipation of the 1975 elections.

On April 19, 1973, plaintiffs, being dissatisfied with the 1973 Acts, filed their objections in this Court.

In the midst of the well known burdens imposed upon and shouldered by three-judge Courts in numerous such cases filed in Mississippi, having waited also for the completion of a judicial reapportionment of Hinds County then in progress, we reconvened on February 7, 1975, to consider the constitutionality of the 1973 legislation.

The Mississippi Legislature was then in session and several of its members attended the hearing. They heard the various objections raised. Some of them testified. They heard the discussion of what the Supreme Court, two weeks previously, had decided in *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

Among other things, some of which will be mentioned later in this opinion, the Supreme Court said:

"We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its Legislature or other body, rather than of a federal court (citations omitted). Hopefully, the 1975 North Dakota Legislative Assembly will perform that duty and enact a constitutionally acceptable plan. If it fails in that task, the responsibility falls on the District Court and it should proceed with dis-

patch to resolve this seemingly interminable problem."

Immediately after the hearing of February 7, it became public knowledge that the Legislature had initiated another effort to reapportion its membership. Heeding the teachings of *Meier,* we delayed a decision on the 1973 Acts to see if they were to be replaced by a 1975 enactment.

The Legislature did enact Senate Bill 2976 of the Acts of the Regular Session of 1975, reapportioning the State Senate, and House Bill 1290 of the same Session, reapportioning the House of Representatives. These bills were approved by the Governor on April 7 and 8.

As we saw it, this mooted prior proceedings before this Court. On April 10, 1975, we dismissed finally all prior proceedings without prejudice. We directed the plaintiffs to file, within five days, an amended complaint, directed to the 1975 Reapportionment Acts. The defendants were required to answer within five days thereafter.

We thus began with a fresh record, shorn of the papers accumulated during the previous ten years,[2] facilitating a resolution of the issues pertinent to the 1975 enactments, and likewise facilitating Supreme Court review, which was sure to follow.

### The Law

#### (1)

#### One Person-One Vote

The appropriate standards of the one person-one vote rule applicable to state legislative reapportionment are no longer open to speculation or substantial doubt. In this connection, the 1973 Spring Term of the Supreme Court began a new era for the courts and for state legislators. See, Albany Law Review, Volume 38, Page 798 (1974).

On February 21, 1973, the Court handed down *Mahan v. Howell,* 410 U.S. 315,
93 S.Ct. 979, 35 L.Ed.2d 320. It held that a reapportionment statute maintaining the integrity of traditional county and city boundaries in Virginia while reapportioning legislative districts in a manner resulting in a percentage variation of 16.4 percent from the ideal district, with an average percentage variation of ± 3.89 percent, and providing for a combination of 52 single-member, multimember and floater delegate districts from which 100 delegates would be elected did not violate the Equal Protection Clause of the Fourteenth Amendment. It let stand multimember districts in Fairfax County, each for the election of five legislators.

In *Mahan,* the Supreme Court taught us that the constitutional validity of the reapportionment and redistricting of state legislative bodies (when done by the Legislature) is to be determined by the application of an "as nearly as practicable" equal protection test, not by a stringent population test. It was further held that the policy of preserving political boundaries is rational, that a rational state policy may justify deviations from the population requirements otherwise required by the Equal Protection Clause, and that a 16.4 percent maximum deviation from population equality may have approached but did not exceed tolerable limits.

The Court warned, of course, that the goal of substantial population equality may not be emasculated.

Then, on June 18, 1973, the Supreme Court decided *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298.

The Connecticut Legislature could not agree on a plan of reapportionment; neither could an eight member bipartisan commission. No plan emerged until after the matter was submitted to another commission composed of state court judges, which approved a plan only by a majority vote. The results were challenged, one of the complaints being that

---

2. The office file of the author of this opinion dealing with this litigation, 1965–1975, contains papers approaching two feet in depth.

the plan amounted to a political gerrymander. A three-judge district court invalidated the plan. The Supreme Court reversed.

The *Gaffney* Court told us that only those limited population variances may be permitted for which justification is shown or which are unavoidable despite a good faith effort to achieve absolute equality. We were further told that an acceptable plan may not be invalidated simply because another plan could be conceived with lower deviations among the state's legislative districts, 412 U.S. at 741, 93 S.Ct. 2321. The test for districts in state reapportionment is that they must be "as nearly equal as *prac-ticable*". (Emphasis added) Divergencies from a strict population standard may be based · on legitimate considerations incident to the effectuation of a rational state policy. Population deviations large enough to *require* justification may nevertheless be justifiable and legally sustainable.

It was said:

"Nor is the goal of fair and effective representation furthered by making the standards of reappropriationment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts which themselves must make the political decisions necessary to formulate a plan or accept those made by reapportionment plaintiffs who may have wholly different goals from those embodied in the official plan. . . . . We doubt that the Fourteenth Amendment requires repeated displacement of otherwise appropriate state decision-making in the name of essentially minor deviations from perfect census-population equality that no one, with confidence, can say will deprive any person of fair and effective representation in his state legislature.

"That the Court was not deterred by the hazards of the political thicket when it undertook to adjudicate the reapportionment cases does not mean that it should become bogged down in a vast, intractable apportionment slough, particularly when there is little, if anything, to be accomplished by doing so.

". . . . Was the Master compelled, as a federal constitutional matter, to come up with a plan with smaller variations than were contained in appellees' plans? And what is to happen to the Master's plan if a resourceful mind hits upon a plan better than the Master's by a fraction of a percentage point? Involvements like this must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard.

"The point is, that such involvements should never begin. We have repeatedly recognized that state reapportionment is the task of local legislatures or of those organs of state government selected to perform it. Their work should not be invalidated under the Equal Protection Clause when only minor population variations among districts are proved. . . ."

In cases raising the issue of impermissible population deviations in state legislative reapportionment, "each case must be evaluated on its own facts, and a particular population deviation from the ideal may be permissible in some cases but not in others", *Chapman· v. Meier,* 95 S.Ct. at 763 (1975).

(2)

Dilution of the Black Vote

On this subject we discuss first *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

In that case, multimember districts in Bexar and Dallas Counties were invalidated because the three-judge district court had *found* enhanced opportunities for racial discrimination.

The ruling clique in Dallas County did not need the support of the black com-

munity to win elections, had not exhibited good faith concern for the political and other needs and aspirations of the black community, racial campaign tactics had been used in white precincts to defeat candidates who had the overwhelming support of the black community, the black community had been effectively excluded from participation in the Democratic primary selection process, and was generally not permitted to enter the political process in a reliable and meaningful manner.

As to Bexar County, the three-judge district court *found* that the Mexican-American populace of Bexar "had long suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others". Seventy eight percent of the Mexican-American community, amounting to 29 percent of the population of the County, resided in the Barrio, suffered from cultural and language barriers that made their participation in community processes extremely difficult. Mexican-American registration was "very poor". The Bexar County legislative delegation in the House was insufficiently responsive to Mexican-American interests. The District Court found that the Bexar County Mexican-Americans "are effectively removed from the political processes of Bexar County".

The Supreme Court was not inclined to overturn this "intensely local appraisal".

It did say, however, that the fact that a racial group has not had legislative representation is not enough to establish invidious discrimination.

In *Gaffney v. Cummings, supra,* it was pointed out that "multimember districts may be vulnerable, if racial or political groups have been fenced out of the political process and their voting strength invidiously minimized".

█ On the other hand, there is no duty to deliberately draw lines so as to insure the election of members of sizable racial, ethnic, economic or religious groups, *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 1875–1878, 29 L.Ed. 2d 363 (1971). A minority group is not constitutionally entitled to an apportionment structure designed to maximize its political advantage, *Turner v. McKeithen,* 5 Cir., 1973, 490 F.2d 191, 197. Under that rule, a minority group is not entitled to another redistricting so that a majority of the voters in at least one district of a county would be black, *Gilbert v. Sterrett,* 5 Cir., 1975, 509 F.2d 1389.

When is a group fenced out?

What constitutes a fence?

What is dilution made of?

The Fifth Circuit answered these questions in *Bradas v. Rapides Parish Police Jury,* 5 Cir., 1975, 508 F.2d 1109, rehearing *en banc* denied, 510 F.2d 1407 (1975).

In Louisiana the police jury is essentially a parish legislature, 508 F.2d at 1110, fn. 4. A ward is the basic territorial subdivision of the parish. Rapides had eleven wards. No black had ever been elected to serve on either the police jury or the school board.

We quote from the opinion, 508 F.2d at 1112:

Consideration of the evidence below in the light of these factors emphasizes the dearth of appellees' proof. Neither the record nor the district court's findings indicates difficulty on behalf of blacks in registering to vote, in choosing the political party they desire to support, in meaningfully participating in party activities, in qualifying as candidates for a desired office, in participating in the candidate selection process, or in participating meaningfully in any other portion of the political process. The record does not evidence a state policy favoring multi-member districts that is rooted in racial discrimination, nor does it indicate a lack of responsiveness on behalf of elected officials to the particular concerns of the black community.

The single glaring fact that no black has ever been elected to a parish office does not by itself support judicial nullification of a reapportionment plan. It evidences no more at the most than a policy of past discrimination. But the issue here of course is not whether Rapides Parish discriminated against blacks in the past, but rather whether any debilitating effects of that discrimination still persist. See *Zimmer, supra,* 485 F.2d at 1306. In previous cases such debilitating effects have usually been shown by a relatively large discrepancy between the size of the black population and the number of registered black voters, *Zimmer, supra,* 485 F.2d at 1306, or between the number of blacks registered to vote in federal elections and the number of blacks registered to vote in state elections. *Turner, supra,* 490 F.2d at 195. A finding of continuing effects of past discrimination is not supported by any evidence in this record.

Likewise it does not suffice to show that the use of multi-member districts has diminished to some extent the proportion of blacks in the voting unit unless some evidence also demonstrates that such multi-member districts were "conceived or operated as purposeful devices to further racial or economic discrimination." *Whitcomb v. Chavis,* 1971, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363. To the same extent that the black proportional strength in Ward 1 is decreased by "tacking on" the substantially white Ward 8, the proportional strength of the blacks in Ward 8 has increased. While we have previously recognized that "such increases or decreases in proportional strength resulting from the change from one apportionment system to another may in some cases provide significant evidence of (discriminatory) motive or effect," *Turner, supra,* 490 F.2d at 196, the 5% decrease involved before us does not assume compelling significance.

"In *Howard v. Adams County Board of Supervisors* (5 Cir. 1972, 453 F.2d 455, 457) this court stated that to establish the existence of a constitutionally impermissible redistricting plan, plaintiffs must maintain the burden of showing either first, a racially motivated gerrymander, or a plan drawn along racial lines, or second, that '. . . designedly or otherwise, a(n) . . . apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.'" *Zimmer, supra,* 485 F.2d at 1304.

### Legislative History of the Acts and Findings Thereasto

#### Senate

Floor debates in the Mississippi Legislature are not stenographically reported or mechanically recorded.

As to the legislation now under consideration, however, we do have the committee reports and the recitations of the bills.

Senate Bill No. 2976 recites that the Legislature recognizes its primary responsibility "as recently emphasized by the Supreme Court in *Chapman v. Meier*" and that it is aware of the guidelines prescribed in *Mahan v. Howell.* The Bill further recites that "from the attainment of statehood in 1817, Mississippi has structured the apportionment of its Legislature on county lines, there being no instances of the election of Senators from a district smaller than a county. No district has ever been established by combining parts of one (1) county with portions of others because the county is the basic, traditional governmental unit upon which the state is organized and through which such primary functions as courts, elections and taxation have been conducted". From the Mississippi Constitutions of 1817, 1832, 1869 and 1890, this Court takes ju-

dicial notice that this legislative statement is literally true.

Prior to the enactment of the Bill a Report of the Senate Committee on Elections, entitled "Legislative History and Statement of Intent" was adopted by the Senate by a vote of 51 to 1. This report listed the decisions of the United States Supreme Court and of this three-judge court dealing with legislative reapportionment. The Committee had also studied reapportionment proposals submitted by Mayor Charles Evers, well known black leader and candidate for governor in 1971. Additionally, it had studied the plan submitted by the plaintiffs to this Court.

The following excerpt from the Committee Report is of significance:

"The committee, in its earliest deliberations, considering the manner in which counties are structured and governed in Mississippi and the need to quite frequently pass legislation dealing only with particular counties, determined that the policy of maintaining the integrity of county lines in establishing legislative districts should be continued.

"It might be pointed out that county lines have remained unchanged with only a few exceptions since 1890, and that the Legislature and courts, since the Constitution of 1890, have recognized the integrity of county lines in establishing legislative districts."

Mayor Evers appeared before the Committee and concurred that the integrity of county lines should be maintained.

The Committee then proceeded to say:

"The committee, desiring to respect county lines, nevertheless is aware and recognizes that it is under a constitutional duty to 'make an honest and good faith effort to construct legislative districts in both Houses of its Legislature as nearly equal in population as is practicable', *Mahan v. Howell, supra.* This we have done our very best to do. We have also sought to reduce multimember districts as much

as possible, still giving effect to the one-person, one-vote requirement of the United States Constitution, and attempted to continue the policy of this state to maintain the integrity of political subdivision lines in the reapportionment of legislative seats. We have sought to produce a minimum deviation above and below the norm, keeping political boundaries intact.

"Since the county is such a basic unit of government in Mississippi, and since so much legislation is passed by the Legislature which directly affects the individual county as a whole and so much legislation is passed which directly affects each and every county in the state as a whole, and since very seldom is legislation passed affecting only parts of a county, and since 10 of the 12 Representatives from Hinds County are to be elected by beats and only 2 Representatives from Hinds County are to be elected at large, the committee has determined that the 5 Senators from Hinds County should be elected at large. To require that the Senators from Hinds County be elected by and from beats of the county would mean that not a single Senator from Hinds County would be elected to represent Hinds County as a whole. The United States Supreme Court in *Mahan v. Howell, supra,* approved two five-member senatorial districts established by the Legislature in Virginia. It is the sense of this committee that, in the event Hinds County should ever elect more than 5 Senators, a different policy should prevail."

The Committee Report then discusses, at length, proposals advanced by Mayor Charles Evers for the enhancement of black voting strength. It was found that the maximum population deviation in the Evers plan was 47.2 percent and the Committee felt that the Courts would disapprove such a plan.

The Committee then further reported, as follows:

"The committee also considered a proposal for reapportionment which

was presented to the United States District Court by the plaintiffs in the action currently pending before that court styled *Connor v. Waller.*

"This proposal admittedly achieves a greater mathematical exactness than does the proposal reported by the committee in Senate Bill 2976, but the committee feels that the final product of the plaintiff's proposal is impracticable and unworkable. In the plaintiffs proposal, the maximum deviation above the norm is 1.66% found in District 18 composed of Clay County and part of Oktibbeha County. The maximum deviation below the norm is 1.73% found in District 52 composed of a part of Jackson County. The total variance therefore is only 3.39% from the maximum negative deviation of 1.73% to the maximum positive deviation of 1.66% a figure which the committee would be pleased to approve if the apportionment structure which yields that low variance were otherwise practicable.

"The plaintiffs proposal initiates a new reapportionment procedure for Mississippi—the division of counties and even of beats within counties for the purpose of establishing legislative districts. A review of the plaintiff's proposal indicates that 40 of the 52 districts or 77% of the districts created by the plaintiffs cross county lines and that 46, or 89%, of the new districts cross supervisor's beat lines within the county in creating the districts. Only 4 proposed districts, Districts 1, 12, 21 and 22 are composed of counties which are not divided or are composed of a subdivision of a county.

"The plaintiff's proposal was not approved by the committee because the committee did not want to abrogate the historical state policy of creating Senate districts coinciding with county lines, because the committee did not want to abridge the traditional power of local government to establish voting precincts and because the committee did not want to create unnecessary confusion and impose an unwarranted hardship upon voters and election officials by structuring voting precincts on enumeration districts which are subject to frequent change."

The Committee then described its reapportionment plan, concluding that it had an average precentage variance of 6.12 percent, the average deviation above the norm being 6.45 percent and the average deviation below the norm being 5.63 percent. No district varies from the norm by as much as 10 percent, and sixteen of the thirty three districts vary by less than 5 percent.

### Findings on the Senate Plan

The plaintiffs having offered no credible evidence to the contrary, we find as a fact that the Senate, as advised by its Committee, was aware of the one person-one vote reapportionment standards mandated by the Constitution of the United States, that it made an honest effort in good faith to comply with those standards and that, in fact, it complied with those standards.

The matter of racial dilution is reserved for discussion in a later portion of this opinion.

### House of Representatives

The report of the House Committee on apportionment and elections on House Bill No. 1290 is ten typewritten pages in length, legal size. It is too lengthy for inclusion in this opinion *in toto.* This Court has closely studied the Committee Report. As to all pertinent factors, there is no substantial distinction between it and the Senate Committee Report, except that Mayor Evers is not reported to have appeared before the House Committee, although he may have done so.

Interestingly enough, after its study, the House Committee recommended, *with three exceptions,* exactly the same alignment of districts, numbered the same, composed of the same counties, as directed by this Court in its decrees of May 18

and May 21, 1971, D.C.Miss., 330 F.Supp. beginning at Page 509. Recognizing the particular circumstances in Hinds, Harrison, and Jackson Counties, the Legislature made different provisions for the election of Representatives from those Counties.

## HINDS COUNTY

As to Hinds County (District 31, composed of 12 Representatives), it is directed that 2 Representatives shall be elected from the County-at-Large and 2 Representatives shall be residents of and be elected from each of the five Supervisors Districts of that County. It was further directed that the election by beats should be from the beats as established by the judgment of the United States District Court for the Southern District of Mississippi reapportioning the Supervisors Districts of said County in the case of *Kirksey v. The Board of Supervisors of Hinds County*, Civil Action No. 4939.

We take judicial notice that on April 24, 1975, the said United States District Court did reapportion the Supervisors Districts in said County so that the population of the five beats will be, respectively, as follows:

District 1, 42,948

District 2, 43,061

District 3, 43,199

District 4, 43,010

District 5, 42,755

The maximum population deviation in this plan is 1.04 percent. Two of the Districts, electing four Representatives, are black majority Districts.

We entertain not the slightest doubt that the procedure devised for Hinds County substantially complies with one person-one vote standards.

## HARRISON COUNTY

Prior to 1962, under the outmoded legislative reapportionment formula cemented into the Constitution of 1890, Harrison County had only one Representative and participated in the election of a Floater Representative. Subsequent to *Baker v. Carr,* the County has been entitled to seven Representatives. Under the reapportionment plan ordered by the Court in 1971, the seven Representatives from Harrison County were elected by county wide vote. House Bill No. 1290 of the Acts of 1975 recognizes that the United States District Court has acquired jurisdiction over the reapportionment of Harrison County for the election of Supervisors, that is, for the division of the County into five districts of substantially equal population. The Legislature directed that should said districts be determined by decision of the United States District Court prior to June 6, 1975, then one Representative should be elected from each of the five districts and two Representatives should be elected by the county at large.

This Court takes judicial notice of the fact that on May 16, 1975, in the case, Civil No. 3146, Southern Division of the United States District Court for the Southern District of Mississippi, styled *William D. G. Skellie and Eugene J. Niolet v. Ernest C. Melvin,* the defendant Board of Supervisors of Harrison County was given until May 21, 1975, in which to file with said Court a plan dividing Harrison County into five districts in compliance with the one person-one vote rule.

According to the 1970 Census, the population of the five supervisors districts of Harrison County was as follows:

District 1, 23,151

District 2, 31,480

District 3, 17,276

District 4, 21,082

District 5, 41,593

This Census, however, was taken at the height of the population displacement caused by Hurricane Camille in August, 1969.

If the population today were distributed as reflected by the Census of 1970,

said districts would be seriously malapportioned.

Presumably, the redistricting plan which must be filed on or before May 21, will reflect population distribution as it now exists.

No doubt the Legislature was impressed by the fact that in 1971 the Supreme Court had looked with a skeptical eye upon electing seven Representatives from Harrison County at large. The Legislature certainly knew that prior to the enactment of the 1973 Act, now repealed, this Court had expected to appoint a special master to divide the County into seven single member districts.

By a prior order in the Harrison County redistricting case, the District Court had deferred action because of the disruption caused by Hurricane Camille. There is no reason, as of the present, to assume or presume that the District Court will falter in its intention to speedily redistrict the County as indicated by its order of May 16.

If there should be a failure, we direct the Attorney General of Mississippi, who is a party defendant, to move forthwith to intervene in the Harrison County reapportionment case on behalf of the people of Mississippi, who are entitled to a fairly apportioned Legislature, and to pursue with diligence the efforts to have the County properly reapportioned. We further direct that when such reapportionment shall have been accomplished, as a finality, the Attorney General shall forthwith apply to this Court for its judgment as to whether or not a special election shall then be called to elect Representatives from the properly apportioned Supervisors Districts. If the reapportionment is completed by the filing deadline of June 5, 1975, then the necessity for special elections will have been mooted.

The District Judge to whom the Harrison County case is assigned will, we believe, move with celerity, for he has only recently completed the most difficult task of reapportioning Hinds County, the most populous and one of the largest in land area in the State.

## JACKSON COUNTY

Jackson County, population 87,975, is, of necessity, combined in District 46 with George County, population 12,459. Jackson is bounded on the South by Mississippi Sound and on the East by Alabama. George County is bounded on the East by Alabama. It has only one third of the people required for the election of a Representative. The Legislature sought to avoid having George totally disenfranchised by requiring that one of the Representatives elected from the District should be a resident of that County.

The Act further provided that the remaining five Representatives from District 46 should reside, respectively, in one of each of the five Supervisors Districts of Jackson County but should be elected by the district at large, that is by both George and Jackson Counties.

This plan is, we think, subject to criticism. It provides for at large elections of six Representatives, which is one more than the number approved by the Supreme Court in Fairfax County, Virginia. If, however, the five Representatives residing in Jackson County are elected one from each Supervisors District, then Jackson County would be denied all county wide representation in the Mississippi Legislature, a result hardly to be desired since the County is the most heavily industrialized of any in the State, has a highly mobile population, and conflicting interests represented, for example, by industry on one hand and fishing and recreational interests on the other. The arrangement here may be a Solomonic one, but it appears to be the best that can be done under the circumstances. We know of no better remedy. It must be noted that on February 18, 1970, in the case of *E. B. Sigalas v. Lum R. Cumbest, Et Al.*, C.A. 3239, not appealed, the United States District Court for the Southern Division of the Southern District of Mississippi reappor-

tioned Jackson County into five districts of substantially equal voting population, as follows:

District 1, 5890

District 2, 5625

District 3, 5906

District 4, 5925

District 5, 5683

With one Representative residing in each of these districts it hardly appears that the interests of the people in any beat would be ignored and county wide participation in their election will eliminate prejudice to any part of the County.

Since the reapportionment process for the State as a whole ran out of cloth at this point, we decline to hold that this arrangement violates the one person-one vote rule. Each case must be decided on its own facts, *Chapman v. Meier, supra.*

Population Ratios for the House
of Representatives from the
State as a Whole

The apportionment plan for the House of Representatives has an average percentage variance of 9.99 percent, with the average deviation above the norm being 4.45 percent, the average below the norm 5.54 percent, and no district varies above or below by as much as 10 percent. Twenty one of the districts vary by less than 5 percent.

We have taken a look at the maximum variations which are in excess of the deviation approved in *Mahan v. Howell.*

District 3, DeSoto and Marshall Counties, is 9.9 percent above the norm and District 18, Grenada and Montgomery, near the center of the State, is below the norm by 9.8 percent, for a maximum deviation of 19.7 percent. We take note of the fact that Marshall County, bordering Tennessee, is 30 percent above the population norm for one Representative and must be combined somewhere if 5856 of its citizens are not to be left out of the equation. On the other hand, DeSoto County, the northern border of which is twelve miles from downtown Memphis, is the fastest growing County in the State. The 1970 figures are already much out of date, the exact extent of which we know not, but the situation here will present a massive change when the 1980 Census figures are known.

This Court takes judicial notice of its independent efforts, by computer and otherwise, to create the 1971 plan, D.C. Miss., 330 F.Supp. 506. Looking at the picture statewide, the Court is aware of no better solution for the situation prevailing in Marshall and DeSoto. The Legislature has done what this Court did. After 1980 this area will most likely be entitled to four Representatives.

District 36, Simpson County is 9.7 percent above the norm, while District 34, Amite, Franklin, and Wilkinson, a thinly populated area, squeezed in between the Mississippi River and the Louisiana boundary, is 9.5 percent below the norm, for a maximum deviation of 19.2 per cent. The Legislature placed these Counties exactly as this Court, for lack of a better alternative, placed them in 1971.

District 19, Attala County, in the geographical center of the State, is 7.7 percent above the norm, while District 14, Bolivar County, on the Mississippi River bordering Arkansas, is 9.3 percent below the norm, for a maximum of 17 percent.

All other Districts are within the Virginia ceiling which approached, but did not reach, impermissibility.

It is fortunate, we think, that out of forty six House Districts only six are above the maximum deviation permitted in *Mahan v. Howell,* one pair of Districts by 3.3 percent, another by 2.8 percent, and the last by .6 of one percent.

Mississippi has a total population of 2,216,912 people, residing in eighty two counties. On a computerized basis, the norm for each county would be 27,035. Twenty two counties have less than half of that population. Issaquena, on the River, has 2,737. Ten counties have less

than 10,000 people. Thirty counties have an area of less than 500 square miles.

The State has three highly diverse geographical regions, the Yazoo-Mississippi Delta, the Northeast hills, and the Piney Woods, which merge with the Gulf Coast. The disparities in these regions account in a large measure for abrupt deviations in population, even in adjoining counties. Senator J. Z. George and his associates in the Constitutional Convention of 1890 tried to compensate for these divergencies by erecting three "grand divisions", the counties designated for each, for the purpose of legislative reapportionment. No division could have less than one third of the total representation in the House. Section 254 of the Constitution of 1890.

Under the impact of one person-one vote, the "grand divisions" are long gone. They had to go because, in the present day, many of the counties had three times more, or three times less, representation than their population entitled them to have.

In accomplishing a valid reapportionment of the Mississippi Legislature, the mind boggling problem is to begin at the Tennessee border and move southward between Alabama and the Father of Waters to the Gulf of Mexico, winding up with legislative districts as close to the population norm as "may be practicable". From our own experience in formulating the 1971 plan, we know that the difficulties would be hard to exaggerate.

We conclude this discussion of the one person-one vote reapportionment of the Mississippi Legislature by quoting from our 1971 opinion in this case, 330 F.Supp. at 518:

In Mississippi each County is divided into five beats, which are the units of county government. Supervisors, school board members, local election commissioners, justices of the peace, and constables, (local county officials) are elected from the beats. The

plaintiffs have suggested that a more nearly equal apportionment might be attained in some instances by separating a beat from the county to which it belongs and adding it to another county in order to attain a population figure more closely approaching the norm and in order to create districts for the election of a single legislator. It is the opinion of the Court, however, that such action is not necessary in order to attain satisfactory reapportionment, as the hereinabove tables of population clearly demonstrate.

There are two added objections. First, the County has always been the only unit of state government. The boundaries have been fixed by statute for generations. Every citizen, regardless of his lack of education or other opportunities, knows the county of his residence and where he is expected to vote. There are 410 beats in Mississippi, the boundaries of which may be, and often are, changed by order of the Board of Supervisors. Beat lines generally follow governmental land lines as laid down by section, township, and range—in other words invisible to all, and unknown to most. It is a rare individual who knows where a beat line is at any given point, although most are able to keep up with the general location of the beat for the purpose of electing local officials with whom the voter is personally acquainted. Even worse, in our opinion, is the thought that a beat taken from one county and arbitrarily annexed to another for the sole purpose of attaining a desired, arbitrary population ratio, would, in practical effect, destroy the weight of the vote of the annexed (minority) beat. The voter would *appear* to be voting on an equality, and mathematically this would be so, but his chance of influencing the outcome desired by the great majority living in the adjoining county would be ephemeral.

We, therefore, adhere to county lines as the best, fairest and most effective method of delineating districts for the election of state legislators in Mississippi.

We must not overlook the fact that as in Virginia, Section 89 of the Mississippi Constitution of 1890 provides for local and private legislation.[3] The litigants in this case have not provided the Court with any statistics on the volume of local and private legislation annually enacted by the Mississippi Legislature but we take judicial notice of the fact that it is considerable. As to any particular county, it is often of crucial importance.

From the foregoing, adopting all statements of fact made on the responsibility of the Court as findings of fact, we summarize, as findings of fact.

1. The preservation of the integrity of county lines from the very beginning has been, and is, uniform state governmental policy and tradition in Mississippi. At the May 7 hearing counsel for plaintiffs conceded [Transcript, Page 8] that no instance could be found from 1817 to date in which county lines had been breached in setting up legislative districts. As the Supreme Court recognized in *Mahan, supra,* it is a rational policy.

2. In the 1975 legislative reapportionment now under consideration, the Legislature acted awarely of its constitutional responsibilities. It made an honest effort in good faith to comply with those responsibilities.

3. It did comply with those responsibilities.

4. The Acts reapportioning the House and the Senate, with the exception of Harrison County, represent as nearly as practicable, a compliance with the standards of the one person-one vote rule as enunciated by the Supreme Court of the United States. Any deviations from the population norm, with the noted exception, were reasonably unavoidable and, as hereinabove set forth, were constitutionally justified.

5. The reapportionment plan adopted by the Legislature, except as to Harrison County, grants substantially equal weight to every vote of every citizen in the selection of the Mississippi Legislature. We have no doubt that the 1975 reapportionment of the Mississippi Legislature will not deprive any person of fair and effectual representation in that lawmaking body, *Gaffney v. Cummings, supra.* This intensely local appraisal is born of ten years' experience with this case, *White v. Regester, supra.*

We turn now to the issue concerning the alleged dilution of black voting strength, the applicable law having already been stated.

*Facts Concerning Dilution of the Black Vote*

The irony of the one person-one vote rule is that it caused a drastic dilution

---

3. There shall be appointed in each house of the legislature a standing committee on local and private legislation; the house committee to consist of seven representatives, and the senate committee of five senators. No local or private bill shall be passed by either house until it shall have been referred to said committee thereof, and shall have been reported back with a recommendation in writing that it do pass, stating affirmatively the reasons therefor, and why the end to be accomplished should not be reached by a general law, or by a proceeding in court; or if the recommendation of the committee be that the bill do not pass, then it shall not pass the house to which it is so reported unless it be voted for by a majority of all members elected thereto. If a bill is passed in conformity to the requirements hereof, other than such as are prohibited in the next section, the courts shall not, because of its local, special, or private nature, refuse to enforce it.

of black legislative voting strength. Many of the majority black voting counties fell far short of having the population required to retain the seats theretofore assigned to them. The evidence of this is found in the following table which reflects the population in the black majority counties in 1960, their representation in the House in 1960, and the applicable norm today.

| COUNTY | BLACK Pop. 1960 | WHITE Pop. 1960 | HOUSE Members 1960 | HOUSE MEMBERS (By Norm) 1970 Census |
|--------|------|------|------|------|
| Amite | 8,440 | 7,130 | 2 | 0.75 |
| Bolivar | 36,663 | 17,521 | 3 | 3.00 |
| Carroll | 6,492 | 4,677 | 2 | 0.57 |
| Claiborne | 8,239 | 2,600 | 1 1/2 | 0.55 |
| Clay | 9,717 | 9,214 | 2 | 1.00 |
| Coahoma | 31,440 | 14,630 | 2 | 2.23 |
| Copiah | 14,058 | 12,992 | 3 | 1.35 |
| DeSoto | 14,625 | 9,248 | 2 | 1.90 |
| Holmes | 19,488 | 7,595 | 3 | 1.27 |
| Humphreys | 13,300 | 5,758 | 1 | 0.79 |
| Issaquena | 2,399 | 1,176 | 1 | 0.25 |
| Jasper | 8,437 | 8,402 | 1 1/2 | 0.82 |
| Jefferson | 7,652 | 2,489 | 1 1/2 | 0.52 |
| Jeff Davis | 7,408 | 6,126 | 1 | 0.71 |
| Kemper | 7,212 | 4,828 | 3 | 0.43 |
| Leflore | 30,307 | 16,699 | 1 | 2.30 |
| Madison | 23,630 | 9,267 | 2 | 1.60 |
| Marshall | 17,239 | 7,264 | 3 | 1.30 |
| Noxubee | 12,064 | 4,724 | 3 | 0.78 |
| Panola | 16,216 | 12,565 | 3 | 1.48 |
| Quitman | 13,254 | 7,715 | 1 | 0.87 |
| Sharkey | 7,469 | 3,247 | 1 | 0.49 |
| Sunflower | 30,855 | 14,730 | 1 | 2.00 |
| Tallahatchie | 15,400 | 8,580 | 1 | 1.00 |
| Tate | 10,439 | 7,696 | 2 | 1.00 |
| Tunica | 13,315 | 3,505 | 1 | 0.65 |
| Washington | 43,097 | 35,239 | 3 | 3.50 |
| Wilkinson | 9,428 | 3,807 | 2 | 0.62 |
| Yazoo | 18,759 | 12,862 | 3 1/2 | 1.50 |
| TOTAL | | | 58 | 35 (.23) |

---

* Floater with another County.

It will be seen from the foregoing that pursuant to the 1970 Census the 29 black majority counties of 1960 lost 23 seats in the House of Representatives.[4]

If one took a look at the statistics in isolation (as appears often to be done) he would say that the application of the one person-one vote rule caused the dilution of the black voting strength of these Counties by 40 percent. The facts are that under the apportionment built into the Constitution of 1890 these Counties had been over represented by 22 seats in the Mississippi House of Representatives. Such glaring inequalities made the one person-one vote rule mandatory.

While we do not prolong this opinion to demonstrate it in detail, there were dramatic shake-ups in the white majority Counties as well. One example: Prior to one person-one vote, Choctaw County, the home of the author of this opinion, had elected from one to three Representatives and shared a Senator with another county. Now Choctaw has no Representative alloted to it; it shares a Representative with another county. It shares a Senator with three other counties, not just one. Indeed there are only eleven of the fifty three white counties which are entitled to elect at least one Representative in their own right from single county districts. From 1817 to 1962 each county was guaranteed at least one Representative, elected without the intervention of any other county.

The plaintiffs desire to compound this situation by adding numerous appendices across county lines [beats and census enumeration districts] in which the appendix would be allowed to go to the

polls but whose vote would have no meaningful impact on true equality of representation in a practical sense. As we understand *Mahan v. Howell,* a state is not required to do this if it has a well defined policy of not fracturing its county lines and wishes to maintain that policy.

### Origin of Multimember and Multicounty Districts

The use of multiple member and multiple county legislative districts in Mississippi does not have its origin in a desire to cancel out or minimize black voting strength. Before the Civil War, the State had twenty two multiple member House Districts, electing from two to four members each. It also had eighteen Senatorial Districts, composed of from two to four counties each. Hutchinson's Mississippi Code of 1848, Pages 377, 378.

It is a historical fact that under the impact of the Civil War and Reconstruction the Mississippi Constitutional Convention of 1868 was under the joint control of those who, regrettably, had formerly been slaves and recent arrivals, sometimes uncharitably referred to as Carpetbaggers.

This 1869 Constitution, which provided for universal manhood suffrage, also provided that twenty nine counties should each elect anywhere from two to five Representatives at large. Twenty three of the twenty nine Senatorial districts contained anywhere from two to six counties. Article XI, Mississippi Constitution of 1869, Page 665 Revised Code of 1871.

The policy of more than one legislator from a district and multiple county

---

4. Under the impact of *Baker v. Carr* (1962), the first Mississippi legislative reapportionment since 1890 was undertaken in 1962. In this process, the Mississippi Constitution was amended to reduce the number of Representatives from 140 to 122 because ⅔ of each House and the people at the polls thought that the membership was too large for a State with the size and population of Mississippi. The reduction in members correspondingly increased the population norm required for the election of a Representative. The size of the Senate, however, was increased from 49 to 52.

senatorial districts was in vogue before the Civil War, was reaffirmed by the Reconstruction Constitution, and continued by the Constitution of 1890. It is not only a state policy of ancient origin but it definitely did not arise from racially discriminatory motives. We find this to be an indisputable fact.

## Multimember Senatorial and House Districts

Of the thirty three Senatorial Districts, nineteen districts elect one Senator, eleven districts elect two Senators, two districts elect three Senators, and one district, Hinds County, elects five Senators.

In the House of Representatives, there are forty six districts for the election of 122 Representatives. With the exception of Jackson and George Counties, the circumstances of which have been hereinabove discussed, no electoral entity will choose more than four Representatives and there are very few which fall into the three or four Representative category.

Where more than one Senator or Representative is to be elected from the same electoral jurisdiction, the candidate are required to run by numbered posts, that is post one, post two, post three, etc.

To avoid to confusion involved in casting multiple votes for multiple candidates, Mississippi began adopting the practice in 1954 (Chapter 317, Laws of 1954) of requiring that there be as many posts as there are places to be filled. The candidate qualifies for whatever post he chooses, and by this method the voter is required to vote for only one place for any office at a time. This greatly simplifies the electoral process. It prevents one or two candidates in a group from sweeping the field, particularly candidates who otherwise would have been unopposed. It tends to keep the voter from voting for more candidates than there are offices to be filled, as well as voting for less than the number of places to be filled. Ballots of the former type are thrown out because the will of the voter cannot be ascertained. Those of the latter type would allow the voter to add undue weight to his vote.

For example, if three candidates are to be elected and a voter casts his ballot for only one he has, in effect, voted three times for one candidate. For this reason this practice was long ago prohibited in this State.

It is the view of this Court that the post system gives every candidate a better chance at the office he seeks. Instead of running against a host of candidates for a number of places, he runs only against those seeking the particular place to which he aspires. The post system largely, if not altogether, dispels the weaknesses in electing a number of members from multimember districts, as discussed by the Supreme Court in *Chapman v. Meier*, 95 S.Ct. at 760. To be specific, the voter expresses his or her choice for only one office at a time, as if he were voting in a single member district. There can be no confusion, because each post for each office is so identified on the ballot. Since 1903 Mississippi has required that candidates receive a majority of the votes cast in order to win a party primary. If no candidate gets a majority in the first primary, then a run off is required three weeks later between the two high candidates in the first primary.

As a general rule there are three or more candidates for the same office in the November general elections— Republican, Democrat, and sometimes several Independents.

We, therefore, find that the post system allows the voter a clear cut choice for each place to be filled.

Since there are, generally, no more than three legislative places to be filled at a time, we see nothing constitutionally impermissible about the post system, especially when it is recalled that two districts in Fairfax County, Virginia, were allowed to elect five members of the Virginia House of Delegates.[5]

### Effects of Past Discrimination

For ten years the elective franchise in the State of Mississippi, as in Virginia and other states, has been under the strict scrutiny authorized by the Voting Rights Act of 1965.

Reverend Rims Barber, Associate Director of the Delta Ministry, assisting "persons and groups of people who are oppressed by poverty or by discrimination in the State of Mississippi", a witness for the plaintiffs, estimated that from 65 to 70 percent of the voting age eligible blacks are registered to vote in Mississippi [Transcript, 225], while from 77 to 83 percent of the eligible white citizens are registered. He testified that 80 or 90 of the 410 supervisors districts in Mississippi had black population majorities. In these, ten black supervisors have been elected. He knew of only two instances in recent years when there had been what he considered to be interference with the right to actually cast a ballot in Mississippi. Certain black voters were challenged in a municipal election in the Town of Hollandale in 1973, and in a precinct in Madison County. They, however, were allowed to cast challenged ballots. He thought that the technical bars to political participation in Mississippi are "99 percent down" [Transcript, 253]. There are approximately 1700 voting precincts in Mississippi.

Mr. Henry J. Kirksey, one of the plaintiffs, a black citizen, also testified. He was a candidate for the State Senate in 1971, did not actively campaign, and spent no more than $85.00 campaign expenses. He was running as an Independent, opposing Republican and Democratic nominees. He received about 10,000 votes. Seventeen thousand black citizens were registered to vote in the City of Jackson, the predominant portion of Hinds County. He carried all of the black majority precincts, but apparently failed by several thousands of votes to receive the support of all the black voters. He has voted in nearly all elections in Hinds County since 1961. He has not had any problem since 1961 in participating in the political processes of Hinds County.

This sums up the testimony offered to show that past discrimination remains a viable force in Mississippi electoral processes, the blacks have any difficulty in registering to vote, that they have any difficulty in meaningfully participating in candidate selection, [Mississippi nominates in primary elections; there is no party registration and the voter participates in the primary of his choice] or in participating meaningfully in any other portion of the political processes.

The testimony did show that Representative Clark, presently the only black member of the Legislature, had only one bill enacted into law, but it concerned sickle cell anemia, a dread scourge of the black race, and thus a matter of prime importance to it. The list of bills admitted in evidence dealt mostly with such questions as making it a criminal offense not to vote, posting certain signs on the highway, and declaring state holidays in honor of the late Reverend Martin Luther King, who was not a resident of Mississippi, and of the late Medgar Evers, who was. This was the sole evidence directed toward showing that the Mississippi Legislature is not appropriately responsive to the needs of

---

5. We are not informed as to whether multimember candidates in Virginia are required to run by posts or whether there is a general "melee", from which five candidates attain the top.

our black citizens in such important matters as free public education, health services, welfare benefits, or any other matter of importance to all citizens on a nondiscriminatory basis.

Under the controlling precedents discussed earlier in this opinion, we find as a fact that plaintiffs have failed to carry the burden of proof that in the electoral processes of Mississippi black citizens are now suffering from the impact of past discrimination, that they are hindered, hampered, or in any way impeded in registering to vote or in voting for candidates of their individual choice. As a matter of fact, it is obvious that the Voting Rights Act of 1965 has effectually reduced all such racially discriminatory factors to what honestly may be termed an irreducible minimum. Certainly this is true as to official state policy.

### With Further Reference to Cancellation or Minimization of Black Voting Strength

### Racial Population Distribution in Mississippi

According to the United States Census of 1970, Mississippi had a white population of 1,394,781 and the black inhabitants numbered 815,770—63.4 percent white and 36.9 percent black, if broken strictly along black-white racial lines. There were also 4,037 Indians and a minimal number of other non-white ethnic groups, such as Japanese and Chinese.

The black population is not uniformly distributed throughout the State.

Of the eighty two Counties, twenty six have a black population majority

6. Alcorn, Itawamba, Lee, Pontotoc, Prentiss, Tippah, Tishomingo, and Union. By the norm this area is entitled to four Senators and nine Representatives. By the same

and fifty six are white majority. Eight black majority counties are in the First Congressional District, four are in the Second District, nine are in the Third, five in the Fourth, and none in the Fifth. The Fifth District is located in the Piney-Woods-Gulf Coast area which, comparably, has never had a significant black population.

In the eight Counties in the Northeastern quadrant, the virtually non-slave area which opposed Secession, bounded by Tennessee and Alabama, there were 152,107 whites and 25,333 blacks.[6]

In the nineteen Counties situated wholly or partially in the Yazoo-Mississippi Delta Region, the black population is 286,313, compared to 231,121 whites.

Despite such disparities in black-white population concentration the Legislative reapportionment of 1975 provides for the following:

SENATORS

| | Districts | Senators |
|---|---|---|
| Districts over 50% black | 8 | 12 |
| Districts 36-50% black | 6 | 13 |
| | 14 | 25 |
| Statewide Average Black Population | 36.9% | |
| Senators to be elected from Districts having 36% black population or more | 48.7% | |

REPRESENTATIVES

| | Districts | Representatives |
|---|---|---|
| Districts over 50% black | 10 | 26 |
| Districts 36-50% black | 16 | 46 |
| | 26 | 72 |
| Representatives to be elected from Districts having 36% black population or more | 55% | |

measurement the aggregate black population of these Counties do not meet the norm for one Senator nor for as many as two Representatives.

The breakdown for the various House and Senatorial Districts is as follows:

DISTRICTS FOR HOUSE OF REPRESENTATIVES

| District | Seats | White | Black | Percentage White | Percentage Black |
|---|---|---|---|---|---|
| 1 | 3 | 41,561 | 8,926 | 82% | 18% |
| 2 | 2 | 32,044 | 3,016 | 91% | 9% |
| 3 | 3 | 32,336 | 27,502 | 54% | 46% |
| 4 | 5 | 76,103 | 20,881 | 78% | 22% |
| 5 | 1 | 10,819 | 5,976 | 64% | 36% |
| 6 | 1 | 14,254 | 3,097 | 82% | 18% |
| 7 | 1 | 16,145 | 2,944 | 85% | 15% |
| 8 | 2 | 28,120 | 10,518 | 73% | 27% |
| 9 | 2 | 20,132 | 18,567 | 52% | 48% |
| 10 | 1 | 9,777 | 8,760 | 53% | 47% |
| 11 | 4 | 24,144 | 43,747 | 36% | 64% |
| 12 | 1 | 7,657 | 11,632 | 40% | 60% |
| 13 | 2 | 13,619 | 23,261 | 37% | 63% |
| 14 | 3 | 18,750 | 30,338 | 38% | 62% |
| 15 | 4 | 32,836 | 40,149 | 45% | 55% |
| 16 | 2 | 12,434 | 25,203 | 33% | 67% |
| 17 | 3 | 22,165 | 29,145 | 43% | 57% |
| 18 | 2 | 18,275 | 14,477 | 56% | 44% |
| 19 | 1 | 11,632 | 7,903 | 60% | 40% |
| 20 | 1 | 11,065 | 7,198 | 61% | 39% |
| 21 | 1 | 13,858 | 4,619 | 75% | 25% |
| 22 | 1 | 9,517 | 9,306 | 51% | 49% |
| 23 | 5 | 56,749 | 35,637 | 61% | 39% |

| District | Seats | White | Black | Percentage White | Percentage Black |
|----------|-------|-------|-------|------------------|------------------|
| 24 | 4 | 52,074 | 26,242 | 66% | 34% |
| 25 | 3 | 31,547 | 17,999 | 64% | 36% |
| 26 | 2 | 25,543 | 10,189 | 71% | 29% |
| 27 | 2 | 24,863 | 9,941 | 71% | 29% |
| 28 | 4 | 42,677 | 30,902 | 58% | 42% |
| 29 | 2 | 15,815 | 20,363 | 44% | 56% |
| 30 | 3 | 29,010 | 25,877 | 53% | 47% |
| 31* | 12 | 130,592 | 84,064 | 61% | 39% |
| 32 | 2 | 14,594 | 19,433 | 43% | 57% |
| 33 | 2 | 19,366 | 17,865 | 52% | 48% |
| 34 | 2 | 15,199 | 17,550 | 46% | 54% |
| 35 | 3 | 36,041 | 21,862 | 62% | 38% |
| 36 | 1 | 13,678 | 6,258 | 69% | 31% |
| 37 | 2 | 23,414 | 14,642 | 62% | 38% |
| 38 | 2 | 23,142 | 12,190 | 65% | 35% |
| 39 | 4 | 56,711 | 16,164 | 78% | 22% |
| 40 | 3 | 42,403 | 13,810 | 75% | 25% |
| 41 | 1 | 11,169 | 5,470 | 67% | 33% |
| 42 | 1 | 13,426 | 4,264 | 76% | 24% |
| 43 | 2 | 28,908 | 6,958 | 81% | 19% |
| 44 | 1 | 14,894 | 2,467 | 86% | 14% |
| 45** | 7 | 111,061 | 22,743 | 83% | 17% |
| 46 | 6 | 84,554 | 15,706 | 84% | 16% |

\* Four members from Hinds County are from black majority
 Supervisors Districts.

\*\* This is Harrison County. Population: 111,067 white,
 22,743 Black.

## SENATORIAL DISTRICTS

| District | Seats | White | Black | Per-centage White | Per-centage Black |
|----------|-------|---------|--------|-------------------|-------------------|
| 1 | 2 | 49,649 | 34,207 | 59% | 41% |
| 2 | 1 | 34,749 | 9,190 | 79% | 21% |
| 3 | 1 | 37,211 | 5,777 | 87% | 13% |
| 4 | 2 | 71,576 | 14,349 | 83% | 17% |
| 5 | 1 | 36,571 | 9,548 | 79% | 21% |
| 6 | 2 | 53,672 | 31,518 | 63% | 37% |
| 7 | 1 | 31,786 | 16,382 | 66% | 34% |
| 8 | 1 | 20,132 | 18,567 | 52% | 48% |
| 9 | 1 | 19,689 | 26,494 | 43% | 57% |
| 10 | 1 | 14,232 | 26,013 | 35% | 65% |
| 11 | 2 | 32,369 | 53,599 | 38% | 62% |
| 12 | 2 | 36,892 | 47,920 | 43% | 57% |
| 13 | 1 | 17,550 | 24,374 | 42% | 58% |
| 14 | 1 | 18,811 | 20,322 | 48% | 52% |
| 15 | 2 | 35,341 | 56,352 | 39% | 61% |
| 16 | 1 | 26,699 | 18,765 | 59% | 41% |
| 17 | 1 | 26,156 | 11,296 | 70% | 30% |
| 18 | 1 | 23,413 | 19,401 | 55% | 45% |
| 19 | 2 | 52,074 | 26,242 | 66% | 34% |
| 20 | 1 | 27,606 | 12,240 | 69% | 31% |
| 21 | 1 | 31,529 | 12,354 | 72% | 28% |
| 22 | 5 | 130,592 | 84,064 | 61% | 39% |
| 23 | 1 | 26,474 | 18,355 | 59% | 41% |
| 24 | 2 | 46,650 | 34,252 | 58% | 42% |

| District | Seats | White | Black | Percentage White | Percentage Black |
|----------|-------|-------|-------|------------------|------------------|
| 25 | 2 | 36,961 | 42,411 | 47% | 53% |
| 26 | 1 | 25,306 | 18,915 | 57% | 43% |
| 27 | 3 | 81,556 | 35,554 | 70% | 30% |
| 28 | 1 | 28,804 | 15,700 | 65% | 35% |
| 29 | 1 | 35,602 | 11,182 | 76% | 24% |
| 30 | 2 | 62,931 | 18,028 | 78% | 22% |
| 31 | 1 | 37,582 | 7,561 | 83% | 17% |
| 32 | 3 | 111,061 | 22,743 | 83% | 17% |
| 33 | 2 | 73,547 | 14,258 | 84% | 16% |

From these statistical considerations we conclude, and find as a fact, that black voting strength for the selection of Senators and Representatives is neither minimized nor cancelled out by the Reapportionment Act of 1975.

We shall discuss, however, plaintiffs' objections to certain House and Senate Districts which they contend cancel out or minimize black voting strength.

### An Analysis of Plaintiffs' Racial Dilution Objections to the Legislative Plan of Reapportionment

Plaintiffs' expert witness, Dr. Gordon Henderson, who testified more extensively than any other witness who appeared before the Court, raised racial dilution objections to only six of the thirty three Senatorial Districts as prescribed by the Legislature: Districts numbered 1, 8, 16, 18, 19, and 24 [Transcript, 100].

According to the testimony of Dr. Henderson, *District 1*, DeSoto, Lafayette, and Marshall Counties, two seats, had a population variance of 1.37 percent. He pointed out that Marshall County is a black majority county. He conceded that with a population of 24,017 Marshall lacked 16,000 people having enough for a Senatorial District of its own, therefore combination with some other county is unavoidable. He suggested, however, that Marshall should have been combined with Tate, which would have given a 55.55 percent black population, with one seat, and would have had a population variance of .14 percent.

We note, however, that as constituted by the Legislature, the First District has a 41 percent black population.

Obviously, if Marshall were moved out of the First District and if Tate should be moved from District 9, both Districts would correspondingly be upset. The problem would then be what to do with DeSoto, since it joins only Marshall, Tate, and Tunica. It cannot be moved into Tennessee and it cannot be sent across the river into Arkansas. Under these circumstances, the suggestion that join-

ing Marshall with Tate is constitutionally mandated is rejected as impracticable.

Dr. Henderson next objected to the Eighth District, Panola and Yalobusha, with one Senator. As constituted by the Legislature the District has a 48 percent black population. His alternative was that Panola be combined with Quitman, resulting in a District 53.54 percent black. Quitman, however, is already in a black majority District (No. 9), where the blacks outnumber the whites 26,494 to 19,689. As to racial dilution in Panola, however, that County has a black population majority of only 692 out of a total population of 26,814. Moreover, Dr. Henderson declined to predict that the 2 percent disparity between the black and white population in District 8 would have any predictable impact on the outcome of an election, even if blacks followed the practice of voting only for black candidates and whites did the same as to white candidates. We find that there is not enough disparity in this district to warrant federal court interference with legislative discretion.

He next objected to District 16, Attala, Carroll and Leake. As constituted by the Legislature this District has a black population of 41 percent. The only black majority county in the district is Carroll, and that County has only 145 more black than white.

We are of the opinion that a majority of only 145, out of a total population of 9,397, a majority which may have been lost since 1970 would not justify rejecting the Legislative plan, necessitating, of course, the reshuffling of every checker on the Reapportionment board. According to Census returns, between 1960 and 1970 the black population of Carroll County declined by 1,721 (26%), from 6,492 to 4,771.

The next District which Dr. Henderson questioned is District 18, Noxubee and Oktibbeha. Under the Legislative plan this District has a black population of 45 percent. Although Noxubee County adjoins the Alabama state line and thus hard to move about on the redistricting checkerboard (while at the same time maintaining, within adequate tolerance, the required district population norm elsewhere), Dr. Henderson thought that Noxubee should be combined with Kemper and Winston, which would give a black population advantage of only 1.73 percent, a net black gain of only 6.73 percent. Again, it would seem to us that a 6.73 percent improvement in the black ratio is hardly enough to brand this District as unconstitutional, necessitating a statewide reshuffling of Districts. Between 1960 and 1970, the black population of Noxubee County declined by 3,620 (30%), from 12,064 to 9,444. Indeed, as pointed out by the Supreme Court in *Gaffney v. Cummings*, the 1970 Census, now five years old, is subject to some discount as to racial numbers in any particular locality. Between 1960 and 1970 the black population of Mississippi declined by 99,973 (10%), from 915,743 to 815,770. If this trend has continued, and we have no evidence on the subject, many of the percentages based on the 1970 Census are infected with considerable inaccuracy.

The next District objected to was District 19, Kemper and Lauderdale, which, under the Legislative plan, has a black population of 34 percent. Kemper County has only about one-fourth enough people to qualify for a Senator. It adjoins the Alabama line. Commercially, economically, and socially it is a satellite of the adjoining county of Lauderdale, so the Legislature combined it with Lauderdale. The witness for the plaintiffs said that one possibility would have been to combine Noxubee, Kemper, and Winston. This is the same proposal he made for District 18, and it could hardly have been used for both. Between 1960 and 1970 the black population of Kemper County declined by 2,000 (27%), from 7,212 to 5,612.

The last District was District 24, Claiborne, Copiah, Lincoln, and Simpson. As constituted by the Legislature this District has a black population of 42 percent. Claiborne County has a population of only 10,086. Dr. Henderson suggested that a District should have been composed of Claiborne, Copiah, and Jefferson to form a District which would have had a black majority population of 61.08%. This would have necessitated taking Jefferson out of the southwest corner District (District 25), leaving that District, which has a black majority population of 53 percent, 9,295 people short of the required norm. Claiborne County lost 717 in black population between 1960 and 1970.

### The Plan for the House of Representatives

Dr. Henderson found fault with only seven of the forty six House Districts [Transcript, 137].

The Court carefully went over these objections with him, while he was on the witness stand. We see no necessity for prolonging this already too lengthy opinion by setting forth a detailed District by District analysis. His testimony is of record and we are confident that it presented no facts which would necessitate a reshuffling of the Legislative plan in order to preserve federal constitutional guarantees.

■ Plaintiffs vigorously complain that except for Hinds, Harrison, and Jackson Counties the Legislature has adopted the same plan of reapportionment promulgated by this Court in 1971. Our 1971 plan, as already stated, was based on the premise of maintaining the integrity of county boundaries. We know of no federal constitutional principle which prohibits a state legislature, in its discretion, from adopting as its own a plan, or parts of a plan, which has already passed federal court scrutiny. In 1971, we stated that "we have cast to one side any purpose of discrimination or favoritism of any kind", 330 F.Supp. at 508.

On May 13, plaintiffs filed a post hearing motion to supplement the record with a statement made by the Governor of Mississippi at a press conference on May 7. To avoid confusion, the motion is granted. We attribute no evidentiary value to the statement, however, because it was cast in the form of a general discussion of the issues, was not made in Court and not subject to cross examination. Moreover, the Governor is sworn to uphold the Constitution of the United States and he signed into law the Bills now under review.

### Conclusion

■ For all of the reasons hereinabove set forth, we hold as a matter of law and we find as facts that, with the exception of the election of Representatives from Harrison County (which may be cured), the reapportionment of the Legislature of the State of Mississippi provided in Senate Bill 2976 and House Bill 1290 is not violative of the one person-one vote rule and does not unconstitutionally minimize or cancel out black voting strength for the election of the Mississippi Legislature.

Except as to Harrison County, the complaint will be dismissed with prejudice. As to that County, jurisdiction will be retained to effectuate the purposes with reference thereunto stated.

Counsel for the parties are directed to forthwith prepare and submit a decree accordingly, which any Judge of this Court is hereby authorized to enter for the Court.

The respective parties will bear their own costs.

See Appendix on next page.

APPENDIX

HOUSE BILL NO. 1290

AN ACT TO AMEND SECTION 5–1–1, MISSISSIPPI CODE OF 1972, SO AS TO APPORTION THE MEMBERSHIP OF THE HOUSE OF REPRESENTATIVES OF THE STATE OF MISSISSIPPI IN COMPLIANCE WITH THE ONE-PERSON, ONE-VOTE REQUIREMENT OF THE FEDERAL CONSTITUTION.

WHEREAS, in the case of Mahan v. Howell, 410 U.S. 315 (1973), the Supreme Court of the United States enunciated the most recent guidelines for the reapportionment of state legislatures in compliance with the one-person, one-vote requirement of the Federal Constitution and the prior decisions of that court on the subject, in which it was held that in reapportionment a state may pursue the rational objective of preserving the integrity of its political subdivision lines; and

WHEREAS, from the attainment of statehood in 1817, Mississippi has structured the apportionment of its Legislature on county lines, there being a few instances only of the election of Representatives from a judicial district situated solely within a county. No district has ever been established by combining parts of one county with portions of others because the county is the basic, traditional governmental unit upon which the state is organized and through which such primary functions as courts, elections and taxation have been conducted; and

WHEREAS, the Legislature recognizes its primary responsibility, as recently emphasized by the Supreme Court in *Chapman vs. Meier*, (January 27, 1975) to effectuate legislative reapportionment in compliance with the requirements of the Federal Constitution; and

WHEREAS, the Constitution of Mississippi fixed the number of Representatives at one hundred twenty-two (122), to be chosen from a population of two million two hundred sixteen thousand nine hundred twelve (2,216,912) (1970 census), or one (1) Representative per eighteen thousand one hundred seventy-one (18,171) persons; NOW, THEREFORE,

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI:

SECTION 1. Section 5–1–1, Mississippi Code of 1972, is amended as follows:

5–1–1. The number of Representatives shall be one hundred twenty-two (122) and shall be elected from forty-six (46) districts, composed of counties with district representation as follows:

(1) District 1 shall be composed of Benton, Tippah and Alcorn Counties. One (1) Representative (designated Post No. 1) shall be a resident of and elected by Alcorn County. One (1) Representative (designated Post No. 2) shall be a resident of either Benton or Tippah Counties and elected by Benton and Tippah Counties. One (1) Representative (designated Post No. 3) shall be a resident of any county in the district and elected districtwide.

(2) District 2 shall be composed of Prentiss and Tishomingo Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(3) District 3 shall be composed of DeSoto and Marshall Counties. Three (3) Representatives (designated Post No. 1, Post No. 2 and Post No. 3) shall be elected districtwide.

(4) District 4 shall be composed of Itawamba, Lee and Monroe Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be residents of and elected by Lee County. One (1) Representative (designated Post No. 3) shall be a resident of and elected by Monroe County. One (1) Representative (designated Post No. 4) shall be a resident of and elected by Itawamba County. One (1) Representative (designated Post No. 5) shall be elected districtwide.

(5) District 5 shall be composed of Chickasaw County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(6) District 6 shall be composed of Pontotoc County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(7) District 7 shall be composed of Union County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(8) District 8 shall be composed of Calhoun and Lafayette Counties. One (1) Representative (designated Post No. 1) shall be a resident of Lafayette County and elected districtwide. One (1) Representative (designated Post No. 2) shall be a resident of either county and elected districtwide.

(9) District 9 shall be composed of Panola and Yalobusha Counties. One (1) Representative (designated Post No. 1) shall be a resident of Panola County and elected districtwide. One (1) Representative (designated Post No. 2) shall be a resident of either county and elected districtwide.

(10) District 10 shall be composed of Tate County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(11) District 11 shall be composed of Coahoma, Quitman and Tunica Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be residents of and elected by Coahoma County. One (1) Representative (designated Post No. 3) shall be a resident of either Quitman or Tunica Counties and elected by Quitman and Tunica Counties. One (1) Representative (designated Post No. 4) shall be a resident of any county in the district and elected districtwide.

(12) District 12 shall be composed of Tallahatchie County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(13) District 13 shall be composed of Sunflower County. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(14) District 14 shall be composed of Bolivar County. Three (3) Representatives (designated Post No. 1, Post No. 2 and Post No. 3) shall be elected districtwide.

(15) District 15 shall be composed of Issaquena and Washington Counties. Four (4) Representatives (designated Post No. 1, Post No. 2, Post No. 3 and Post No. 4) shall be elected districtwide.

(16) District 16 shall be composed of Holmes and Humphreys Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(17) District 17 shall be composed of Carroll and Leflore Counties. Three (3) Representatives (designated Post No. 1, Post No. 2 and Post No. 3) shall be elected districtwide.

(18) District 18 shall be composed of Grenada and Montgomery Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(19) District 19 shall be composed of Attala County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(20) District 20 shall be composed of Winston County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(21) District 21 shall be composed of Choctaw and Webster Counties. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(22) District 22 shall be composed of Clay County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(23) District 23 shall be composed of Lowndes, Noxubee and Oktibbeha Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be residents of and elected by Lowndes County. One (1) Representative (designated Post No. 3) shall be a resident of Oktibbeha County, and shall be elected by Oktibbeha and Noxubee Counties. One (1) Representative (designated Post No. 4) shall be a resident of either Oktibbeha or Noxubee Counties and shall be elected by Oktibbeha and Noxubee Counties. One (1) Representative (designated Post No. 5) shall be a resident of any county in the district and elected districtwide.

(24) District 24 shall be composed of Kemper and Lauderdale Counties. Three (3) Representatives (designated Post No. 1, Post No. 2 and Post No. 3) shall be residents of Lauderdale County and elected districtwide. One (1) Representative (designated Post No. 4) shall be a resident of Kemper County and elected districtwide.

(25) District 25 shall be composed of Clarke, Newton and Jasper Counties. One (1) Representative (designated Post No. 1) shall be a resident of and elected by Newton County. One (1) Representative (designated Post No. 2) shall be a resident of either Jasper or Clarke Counties and elected by Jasper and Clarke Counties. One (1) Representative (designated Post No. 3) shall be a resident of any of the three (3) counties and elected districtwide.

(26) District 26 shall be composed of Leake and Neshoba Counties. One (1) Representative (designated Post No. 1) shall be a resident of Neshoba County and elected districtwide. One (1) Representative (designated Post No. 2) shall be a resident of Leake County and elected districtwide.

(27) District 27 shall be composed of Scott and Smith Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(28) District 28 shall be composed of Madison and Rankin Counties. One (1) Representative (designated Post No. 1) shall be a resident of and elected by Madison County. Two (2) Representatives (designated Post No. 2 and Post No. 3) shall be residents of and elected by Rankin County. One (1) Representative (designated Post No. 4) shall be a resident of either county in the district and elected districtwide.

(29) District 29 shall be composed of Sharkey and Yazoo Counties. One (1) Representative (designated Post No. 1) shall be a resident of Yazoo County and elected districtwide. One (1) Representative (designated Post No. 2) shall be a resident of either county and elected districtwide.

(30) District 30 shall be composed of Claiborne and Warren Counties. Three (3) Representatives (designated Post No. 1, Post No. 2 and Post No. 3) shall be elected districtwide.

(31) District 31 shall be composed of Hinds County. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be residents of Supervisors District 1 and elected by Supervisors District 1. Two (2) Representatives (designated Post No. 3 and Post No. 4) shall be residents of Supervisors District 2 and elected by Supervisors District 2. Two (2) Representatives (designated Post No. 5 and Post No. 6) shall be residents of Supervisors District 3 and elected by Supervisors District 3. Two (2) Representatives (designated Post No. 7 and Post No. 8) shall be residents of Supervisors District 4 and elected by Supervisors District 4. Two (2) Representatives (designated Post No. 9 and Post No. 10) shall be residents of Supervisors District 5 and elected by Supervisors District 5. Two (2) Representatives (designated Post No. 11 and Post No. 12) shall be residents of the county and elected by the county at large.

The United States District Court having acquired jurisdiction over the redistricting of the supervisors districts of Hinds County in *Kirksey vs. Board of Supervisors of Hinds County*, Civil Action No. 4939, it is further provided that for the legislative elections to be held in 1975, the Representatives to be elected from District 31 (except those elected from Post No. 11 and Post No. 12) shall be elected as provided above from said supervisors districts as said districts are determined or approved by decision of the United States District Court in said action, regardless of any modifications to said districts brought about by appellate review. In all legislative elections held subsequent to 1975, the Representatives to be elected from District 31 (except those elected from Post No. 11 and Post No. 12) shall be elected as provided above from said supervisors districts as said districts are determined or approved by the district court or as approved or modified by the appellate courts in the event of appeal.

In the event the district court shall not have entered an order determining or modifying the supervisors districts in Hinds County before June 6, 1975, the Representatives to be elected from Hinds County shall be elected from the supervisors districts as constituted on April 1,

1975, and thereafter shall be elected from the supervisors districts as determined or modified by the district court or by an appellate court.

(32) District 32 shall be composed of Copiah and Jefferson Counties. One (1) Representative (designated Post No. 1) shall be a resident of Copiah County and elected districtwide. One (1) Representative (designated Post No. 2) shall be a resident of either County and elected districtwide.

(33) District 33 shall be composed of Adams County. Two (2) Representatives designated Post No. 1 and Post No. 2) shall be elected districtwide.

(34) District 34 shall be composed of Amite, Franklin and Wilkinson Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(35) District 35 shall be composed of Lincoln and Pike Counties. One (1) Representative (designated Post No. 1) shall be a resident of and elected by Pike County. One (1) Representative (designated Post No. 2) shall be a resident of and elected by Lincoln County. One (1) Representative (designated Post No. 3) shall be a resident of either county in the district and elected districtwide.

(36) District 36 shall be composed of Simpson County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(37) District 37 shall be composed of Covington, Jefferson Davis and Lawrence Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(38) District 38 shall be composed of Marion and Walthall Counties. Two (2) Representatives (designated Post No. 1 and Post No. 2) shall be elected districtwide.

(39) District 39 shall be composed of Forrest and Lamar Counties. Four (4) Representatives (designated Post No. 1, Post No. 2, Post No. 3 and Post No. 4) shall be elected districtwide.

(40) District 40 shall be composed of Jones County. Three (3) Representatives (designated Post No. 1, Post No. 2 and Post No. 3) shall be elected districtwide.

(41) District 41 shall be composed of Wayne County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(42) District 42 shall be composed of Greene and Perry Counties. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(43) District 43 shall be composed of Pearl River and Stone Counties. One (1) Representative (designated Post No. 1) shall be a resident of Pearl River County and elected districtwide. One (1) Representative (designated Post No. 2) shall be a resident of either county and elected districtwide.

(44) District 44 shall be composed of Hancock County. One (1) Representative (designated Post No. 1) shall be elected districtwide.

(45) District 45 shall be composed of Harrison County. One (1) Representative (designated Post No. 1) shall be a resident of Supervisors District 1 and shall be elected by Supervisors District 1. One (1) Representative (designated Post No. 2) shall be a resident of Supervisors District 2 and elected by Supervisors District 2. One (1) Representative (designated Post No. 3) shall be a resident of Supervisors District 3 and elected by Supervisors District 3. One (1) Representative (designated Post No. 4) shall be a resident of Supervisors District 4 and elected by Supervisors District 4. One (1) Representative (designated Post No. 5) shall be a resident of Supervisors District 5 and elected by Supervisors District 5. Two (2) Representatives (designated Post No. 6 and Post No. 7) shall be residents of the county and elected by the county-at-large.

The United States District Court having acquired jurisdiction over the redistricting of the supervisors districts of Harrison County in *Reed vs. Quave,* Civil Action No. 3146, it is further provided that for the legislative elections to be held in 1975, the Representatives to be elected from District 45 (except those elected from Post No. 6 and Post No. 7) shall be elected as provided above from said supervisors districts as said districts are determined and approved by decision of the United States District Court in said action, unless modified by said United States District Court prior to June 6, 1975. In all legislative elections held subsequent to 1975, the Representatives to be elected from District 45 (except those elected from Post No. 6 and Post No. 7) shall be elected as provided above from said supervisors districts as said districts are determined or approved by said district court or as approved or modified by the appellate courts in the event of appeal from the decision of said district court.

(46) District 46 shall be composed of Jackson and George Counties. One (1) Representative (designated Post No. 1) shall be a resident of Supervisors District 1, Jackson County, and elected by both counties. One (1) Representative (designated Post No. 2) shall be a resident of Supervisors District 2, Jackson County, and elected by both counties. One (1) Representative (designated Post No. 3) shall be a resident of Supervisors District 3, Jackson County, and elected by both counties. One (1) Representative (designated Post No. 4) shall be a resident of Supervisors District 4, Jackson County, and elected by both counties.

One (1) Representative (designated Post No. 5) shall be a resident of Supervisors District 5, Jackson County, and elected by both counties. One (1) Representative (designated Post No. 6) shall be a resident of George County and elected by both counties.

SECTION 2. To minimize confusion in the electoral process, in all districts for the election of more than one (1) Representative, each Representative shall be nominated and elected by posts in order that the voter may have a clear-cut choice for each seat to be chosen from a specific group of candidates (*Chapman vs. Meier,* Supreme Court decision).

SECTION 3. The United States District Court (three-judge) having reserved jurisdiction over the matter of legislative reapportionment in this state in litigation presently pending, and this being the year for the election of all members of the Mississippi Legislature, the Attorney General is directed to file this act with the clerk of said court, with appropriate prayers for a determination of the constitutionality of the same.

SECTION 4. If any part of this act should be held to be unconstitutional by said court or by the United States Supreme Court, then the same shall be severable from and shall not affect the districts held to meet federal constitutional standards (except as may be found necessary to the correction of unconstitutionalities).

SECTION 5. This act shall take effect and be in force from and after its passage.

APPROVED: APRIL 8, 1975

## SENATE BILL NO. 2976

AN ACT TO BRING FORWARD SECTION 5-1-3, MISSISSIPPI CODE OF 1972, TO REAFFIRM AND REESTABLISH LEGISLATIVE INTENT AND TO DELINEATE THE REASONS THEREFOR; TO DIRECT THE ATTORNEY GENERAL TO SUBMIT THE REAPPORTIONMENT PROPOSAL TO THE UNITED STATES DISTRICT COURT; AND FOR RELATED PURPOSES.

WHEREAS, in the case of *Mahan vs. Howell*, 410 U.S. 315 (1973), the Supreme Court of the United States enunciated the most recent guidelines for the reapportionment of state legislatures in compliance with the one-person, one-vote requirement of the United States Constitution and the prior decisions of that court on the subject, in which it was held that in reapportionment a state may pursue the rational objective of preserving the integrity of its political subdivision lines; and

WHEREAS, from the attainment of statehood in 1817, Mississippi has structured the apportionment of its Legislature on county lines, there being no instances of the election of senators from a district smaller than a county. No district has ever been established by combining parts of one (1) county with portions of others because the county is the basic, traditional governmental unit upon which the state is organized and through which such primary functions as courts, elections and taxation have been conducted; and

WHEREAS, the Legislature recognizes its primary responsibility, as recently emphasized by the Supreme Court in *Chapman vs. Meier*, (January 27, 1975) to effectuate legislative reapportionment in compliance with the requirements of the United States Constitution; and

WHEREAS, the Constitution of Mississippi fixed the number of Senators at fifty-two (52), to be chosen from a population of two million two hundred sixteen thousand nine hundred twelve (2,216,912) (1970 census), or one (1) Senator per forty-two thousand six hundred thirty-four (42,634) persons; NOW, THEREFORE,

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI:

SECTION 1. Section 5–1–3, Mississippi Code of 1972, is amended as follows:

5–1–3. The number of Senators shall be fifty-two (52) and shall be elected from thirty-three (33) districts, composed of the counties and with district representation as follows:

| DISTRICT NUMBER | COUNTY OR COUNTIES | NUMBER OF SENATORS |
|---|---|---|
| 1 | DeSoto, Lafayette and Marshall | 2 |
| 2 | Benton, Pontotoc and Union | 1 |
| 3 | Alcorn and Tippah | 1 |
| 4 | Itawamba, Monroe, Prentiss and Tishomingo | 2 |
| 5 | Lee | 1 |
| 6 | Chickasaw, Clay and Lowndes | 2 |
| 7 | Calhoun, Choctaw, Montgomery and Webster | 1 |
| 8 | Panola and Yalobusha | 1 |
| 9 | Quitman, Tate and Tunica | 1 |
| 10 | Coahoma | 1 |
| 11 | Bolivar and Sunflower | 2 |
| 12 | Humphreys and Washington | 2 |
| 13 | Leflore | 1 |
| 14 | Grenada and Tallahatchie | 1 |
| 15 | Holmes, Issaquena, Madison, Sharkey and Yazoo | 2 |
| 16 | Attala, Carroll and Leake | 1 |
| 17 | Neshoba and Winston | 1 |
| 18 | Noxubee and Oktibbeha | 1 |
| 19 | Kemper and Lauderdale | 2 |
| 20 | Newton and Scott | 1 |
| 21 | Rankin | 1 |
| 22 | Hinds | 5 |
| 23 | Warren | 1 |
| 24 | Claiborne, Copiah, Lincoln and Simpson | 2 |
| 25 | Adams, Amite, Franklin, Jefferson and Wilkinson | 2 |
| 26 | Pike and Walthall | 1 |
| 27 | Covington, Jefferson Davis, Jones, Lawrence and Marion | 3 |
| 28 | Clarke, Jasper and Smith | 1 |
| 29 | George, Greene, Perry and Wayne | 1 |
| 30 | Forrest, Lamar and Stone | 2 |
| 31 | Hancock and Pearl River | 1 |
| 32 | Harrison | 3 |
| 33 | Jackson | 2 |

In each senatorial district electing more than one (1) Senator, each Senator shall be nominated and elected by posts.

In District 27, Jones County shall nominate and elect the Senator to Post 1. The remaining counties shall nominate and elect the Senator to Post 2. Post 3 shall be nominated and elected by the district at large.

SECTION 2. To minimize confusion in the electoral process, in all districts for the election of more than one (1) Senator, each Senator shall be nominated and elected by posts in order that the voter may have a clear-cut choice for each seat to be chosen from a specific group of candidates (*Chapman vs. Meier*, Supreme Court decision).

SECTION 3. The United States District Court (three-judge) having reserved jurisdiction over the matter of legislative reapportionment in this state in litigation presently pending, and this being the year for the election of all members of the Mississippi Legislature, the Attorney General is directed to file this act with the clerk of said court, with appropriate prayers for a determination of the constitutionality of the same.

SECTION 4. If any part of this act should be held to be unconstitutional by said court or by the United States Supreme Court, then the same shall be severable from and shall not affect the districts held to meet federal constitutional standards (except as may be found necessary to the correction of unconstitutionalities).

SECTION 5. This act shall take effect and be in force from and after its passage.

APPROVED: APRIL 7, 1975