# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN,

Petitioners

v.

LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES,

Respondents

: No. 7 MM 2022
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## CONCURRING STATEMENT

**JUSTICE DOUGHERTY**                                      **FILED:  February 2, 2022**

I join the Court's *per curiam* order.  In my view, the practical and policy-based concerns laid out in Chief Justice Baer's concurring statement supply more than enough reason to exercise extraordinary jurisdiction over this important case at this stage.  I write only to offer the following additional perspective.

It is clear "the primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature."  *League of Women Voters v.*

*Commonwealth*, 178 A.3d 737, 821 (Pa. 2018), *citing* U.S. Const. art. I, §4. In Pennsylvania, the redistricting process is relatively straightforward: every ten years, "congressional districts are drawn by the [General Assembly] as a regular statute, subject to veto by the Governor." *Id.* at 742; *accord Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015) ("redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include . . . [a] Governor's veto"). But because this system involves two branches of our Commonwealth government (which, it suffices to say, do not always see eye-to-eye), it naturally invites the possibility of a stalemate. And when that happens, and "an intervening event — most commonly, as here, a [decennial] census — renders the current plan unusable, a court must undertake the 'unwelcome obligation'" of formulating a plan. *Perry v. Perez*, 565 U.S. 388, 392 (2012) (*per curiam*), *quoting Connor v. Finch*, 431 U.S. 407, 415 (1977); *see also League of Women Voters*, 178 A.3d at 824 ("the Pennsylvania Constitution, statutory law, our Court's decisions, federal precedent, and case law from our sister states, all serve as a bedrock foundation on which stands the authority of the state judiciary to formulate a valid redistricting plan when necessary"); *accord, e.g., Growe v. Emison*, 507 U.S. 25, 34 (1993) (recognizing the "legitimacy of state **judicial** redistricting") (emphasis in original); *Scott v. Germano*, 381 U.S. 407, 409 (1985) (*per curiam*) ("The power of the judiciary of a State to require valid reapportionment **or to formulate a valid redistricting plan** has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.") (emphasis added).

These overarching principles are not in dispute here.[1]  However, the present emergency application for extraordinary relief highlights an unresolved issue of state law that I believe warrants our consideration: when, as here, the legislative and executive branches are unable or unwilling to agree on a redistricting plan, thereby forcing the judiciary's reluctant involvement, which court in this Commonwealth is saddled with the unwelcome burden of adopting or creating a plan?  We have never expressly answered this question.  Nevertheless, as far as I can tell, existing law suggests this weighty task and the attendant responsibility of ensuring a plan satisfies the dictates of state and federal law, fall exclusively on this Court.

Redistricting may be rough terrain for the judiciary, but it is not foreign.  In *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992), for example, our sister branches' failure to come to an agreement on a redistricting plan placed the Court in the same position we now find ourselves.  When Pennsylvania lost two congressional seats following the 1990 decennial census, legislator-petitioners filed suit in the Commonwealth Court's original jurisdiction seeking, *inter alia*, the judicial adoption of a valid redistricting plan if the General Assembly failed to enact one by a date certain.  After that deadline came and went, the court ordered

---

[1] Indeed, all parties concede the judiciary's involvement is not only appropriate at this point, but imperative. *See* Emergency Application for Extraordinary Relief at 3 ("[W]hen the legislature is unable or chooses not to act, it becomes the judiciary's role to ensure a valid districting scheme.") (internal quotation and citation omitted); Answer of Governor Wolf at 7 ("the Court should . . . adopt a 17-district congressional redistricting plan"); Joint Answer of House and Senate Republicans at 4 ("The entire purpose of this expedited legislation was to ensure that a map could be timely adopted if the General Assembly and Governor could not agree on a map."); Answer of Acting Secretary of the Commonwealth at 1 (agreeing with Governor Wolf that this Court should adopt a 17-district congressional redistricting plan); Answer of Senate Democrats at 4 ("the Pennsylvania Constitution recognizes the Supreme Court's unique authority to undertake the extraordinary role of developing the maps for the Commonwealth"); Answer of Reschenthaler, *et al.* at 7 ("the need for a new congressional redistricting plan is clear"); Answer of House Democrats at 9 ("this Court . . . has the power, authority, and jurisdiction to fashion any judicial remedy"); Answer of Gressman, *et al.* at 1 ("the judicial branch must act to ensure that Pennsylvania has lawful congressional districts in place before the 2022 elections").

hearings to begin the next day for the purposes of taking evidence and considering proposed plans that had been submitted. At the start of the hearings, however, this Court assumed plenary jurisdiction and reassigned the matter to the President Judge of the Commonwealth Court to serve as a special master. The special master was tasked with concluding the hearings and "report[ing] to us" his findings of fact and a recommendation regarding a proposed plan. *Id.* at 206. We then reviewed those findings and the special master's recommendation before dismissing all exceptions thereto and approving the plan as final.

That we appointed a special master in *Mellow* and instructed him to make **recommendations** for our consideration, rather than to select or create the new plan himself, was surely not mere happenstance. In my view, it may well have been because the lower court lacked the legal power to grant the relief sought. In this respect, I observe the Commonwealth Court possesses specifically defined statutory authority:

> The Commonwealth Court shall have power to issue, under its judicial seal, every lawful writ and process necessary or suitable for the exercise of its jurisdiction and for the enforcement of any order which it may make, including such writs and process to or to be served or enforced by system and related personnel as the courts of common pleas are authorized by law or usage to issue. The court shall also have all powers of a court of record possessed by the courts of common pleas and all powers necessary or appropriate in aid of its appellate jurisdiction which are agreeable to the usages and principles of law.

42 Pa.C.S. §562. But this Court, as "the highest court" in Pennsylvania, is vested with "the supreme judicial power of the Commonwealth." PA. CONST. art. V, §2; *see also* 42 Pa.C.S. §502 ("The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722."). Indeed, our Court

alone "possesses broad authority to craft meaningful remedies when required." *League of Women Voters*, 178 A.3d at 822; *see also* 42 Pa.C.S. §726 ("[n]otwithstanding any other provision of law," this Court may in any matter "enter a final order or otherwise cause right and justice to be done").

As additional support for this view, I note the process we employed in *Mellow* is consistent with this Court's general historical practice in the redistricting arena. In fact, over the last six decades, it appears we have exercised extraordinary jurisdiction in every single case in which the task of drawing Pennsylvania's election districts has fallen to the judiciary. *See League of Women Voters*, 178 A.3d 737; *Erfer v. Commonwealth*, 794 A.2d 325 (Pa. 2002); *Mellow*, 607 A.2d 204; *Butcher v. Bloom*, 203 A.2d 556 (Pa. 1964). More broadly, I am aware of no situation in which any court other than this one has had the last word in a redistricting case. It is not unreasonable, then, to surmise this Court has consistently found it necessary to exercise extraordinary jurisdiction in these types of cases precisely because it, unlike any other court, possesses the "supreme judicial power of the Commonwealth," PA. CONST. art. V, §2, including broad authority to "cause right and justice to be done" in any matter, 42 Pa.C.S. §726.

The present circumstances are instructive. Petitioners filed a petition for review in the Commonwealth Court's original jurisdiction in which they sought declaratory and injunctive relief relative to the congressional district plan currently in place. *See* Petition for Review at 18-19, *Carter v. Chapman*, 464 MD 2021 (Pa. Cmwlth. Dec. 17, 2021) (asking court to (1) "Declare that the current configuration of Pennsylvania's congressional districts violates Article I, Section 5 of the Pennsylvania Constitution; Article 1, Section 2 of the U.S. Constitution; and 2 U.S.C. §2c" and (2) "Enjoin Respondents, their respective agents, officers, employees, and successors . . . from implementing, enforcing, or giving any effect to Pennsylvania's current congressional district plan").

There is no reason to question the Commonwealth Court's authority to resolve these claims. *See, e.g.*, 42 Pa.C.S. §761(a)(1) (vesting original jurisdiction over civil actions or proceedings against Commonwealth government in Commonwealth Court); 42 Pa.C.S. §562 (delineating powers of the Commonwealth Court). And, of course, the well-qualified jurists serving on that tribunal have proven time and again they are more than capable of skillfully handling these complex matters.[2]

But the petition for review filed below also implored that court to do something that goes well beyond a typical request for declaratory or injunctive relief: petitioners asked that court to "[a]dopt a new congressional district plan that complies with Article I, Section 5 of the Pennsylvania Constitution; Article 1, Section 2 of the U.S. Constitution; and 2 U.S.C. §2." Petition for Review at 19, *Carter v. Chapman*, 464 MD 2021 (Pa. Cmwlth. Dec. 17, 2021). It is unclear what authority, if any, the Commonwealth Court possesses that would permit it to fashion such sweeping relief. Although it is true that court has the "power to issue . . . every lawful writ and process necessary or suitable for the exercise of its jurisdiction and for the enforcement of any order which it may make," 42 Pa.C.S. §562, the declaratory and injunctive relief sought by petitioners pertained only to the **current** plan in place, not a future hypothetical one to be chosen by the Commonwealth Court. More importantly, nothing in the statutory authority afforded to the Commonwealth Court remotely appears to endow a single judge of that court with the power to step into the legislature's federal constitutional role to determine the "[t]imes, [p]laces and [m]anner of holding [e]lections" by enacting a judicial redistricting plan. U.S. CONST. art. I, §4. Such an extraordinary judicial legal remedy may fit comfortably within this Court's supreme

---

[2] Indeed, Judge McCullough's efficient handling of the matter thus far proves the point, and this Court will surely benefit from her continued service as special master going forward.

judicial power to cause right and justice to be done, but far less so under the Commonwealth Court's circumscribed authority.

This last point also raises a host of practical concerns. Election redistricting is a notoriously political endeavor, which is why the judiciary usually plays no role in such matters unless called upon or forced to intercede. In those rare circumstances where the other branches of government fail to act, however, and the judiciary is left with the "unwelcome obligation," it makes little sense in my view to impose that duty on the shoulders of a single, randomly selected intermediate court judge. *See, e.g.*, *Smith v. Clark*, 189 F. Supp. 2d 503, 509 (S.D. Miss. 2002) ("giving a single [ ] judge the power to reapportion the entire State's congressional districts . . . presents quite serious concerns"). Indeed, adopting or creating a judicial redistricting plan is a far different beast than assessing the constitutionality of an existing legislative plan; the latter is guided by a set of "neutral criteria" that we have said "provide a 'floor' of protection[,]" *League of Women Voters*, 178 A.3d at 817; but we have yet to establish how, in the former scenario, a court is to select a particular plan in a vacuum, especially where multiple proposals may meet the constitutional floor. *Cf. id.* at 822 ("matters concerning the proper interpretation and application of our Commonwealth's organic charter are at the end of the day for this Court — and only this Court").

To clarify, I reserve judgment on the issues addressed in this concurring statement. Still, I raise them because I believe the time has come for this Court to establish a uniform practice for dealing with redistricting cases such as this. From my respectful point of view, the people of this Commonwealth, as well as the other branches of government upon which the primary responsibility for drawing federal congressional districts rests, have a right to know what to anticipate should the judiciary be dragged into the process. This includes resolving which court(s) possess the authority to select a judicial redistricting

plan in the first place.[3] But it also includes establishing criteria that should guide a court's analysis. As stated, our decision in *League of Women Voters* set forth "neutral criteria [that] provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts" — including compactness, contiguity, respect for the boundaries of political subdivisions, and maintenance of population equality among districts. *Id.* at 817. But we also foresaw the day when this floor might require additional construction. We emphasized "the overarching objective of . . . our constitution is to prevent dilution of an individual's vote by mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens." *Id.* In the event this case presents the opportunity to provide further clarity, I for one am willing to do so, and shine as much light as possible on what many believe is an improperly political and unfairly partisan process.

---

[3] Notably, there is no intermediate court involvement in other important areas such as capital appeals, and even gaming appeals. *See* 4 Pa.C.S. §1904 (vesting this Court with original and exclusive jurisdiction to resolve constitutional challenges to Gaming Act); 42 Pa.C.S. §9711(h)(1) (sentence of death subject to automatic review by this Court).